# EXHIBIT 1

SUPREME COURT OF THE STATE OF NEW YORK
NEW YORK COUNTY: COMMERCIAL DIVISION

PRESENT: **HON. JENNIFER G. SCHECTER**    PART __54__
*Justice*

-----------------------------------------------------------------------X

CHARLES HALL,                                    INDEX NO.    655003/2019

                Plaintiff,

              - v -                       **DECISION AFTER TRIAL**

REGGIE MIDDLETON, VERITASEUM, LLC, VERITASEUM
SECURITIES LLC, VERITASEUM ASSETS LLC,
VERITASEUM HOLDINGS LLC,

                Defendants.

-----------------------------------------------------------------------X

In this derivative action, based on the credible evidence introduced at trial, the court finds that Reggie Middleton wrongfully caused patents belonging to Veritaseum, Inc. (the Company) to be transferred to and owned by himself personally in breach of his fiduciary duty of loyalty to the Company. The evidence established that Middleton represented to the Company's investors that the Company had pending patent applications and the investors were led to believe that they would be investing in a Company that would own these patents (*see, e.g.*, Dkt. 28 at 11). Indeed, the patent applications were filed on behalf of the Company (*see, e.g., id.* at 582). The court rejects Middleton's testimony that these numerous representations were all simply mistakes or that the Company was only supposed to have a royalty-free license. The Q4 report from 2015 leaves no doubt that Middleton was not making a mistake as he comprehensively addressed the value of the patents to the Company (*see id.* at 1064-1077). He made clear that <u>the Company</u> had submitted patent applications (*id.* at 1072, 1077 ["Veritaseum has a filing date" and referring to " Veritaseum patent applications"]) and touted the benefits of having been the "first to file" (*id.* at 1076). The court therefore rejects Middleton's contention that he had the right to personally own the patents. Additionally, regardless of whether Middleton had fraudulent intent at the outset--that issue is academic--it is clear that his current claim that he was really entitled to personally own the patents is nothing more than revisionist history proffered in an attempt to steal the Company's primary assets for himself. His evasive and incredible answers to questions on cross-examination and his conduct resulting in the SEC consent order (Dkt. 29 at 866) convince the court that Middleton is willing to misrepresent the facts and render his testimony unworthy of belief.

Middleton's arguments about the legal requirements for validly assigning patents are inapposite. The question is not whether any of the documents qualify as valid

**DECISION AFTER TRIAL**

assignments. Rather, what matters is that after Middleton procured investment in a company that applied for the patents, he caused the patents to be issued to himself personally. Whether viewed as conversion of corporate property or diversion of a corporate opportunity (based on the Company's tangible expectancy of owning the patents), either way, Middleton breached his fiduciary duty of loyalty to the Company by diverting ownership of the patents to himself (*SantiEsteban v Crowder*, 92 AD3d 544, 546 [1st Dept 2012], citing *Aronoff v Albanese*, 85 AD2d 3, 5 [2d Dept 1982]; *see Alexander & Alexander of N.Y., Inc. v Fritzen*, 147 AD2d 241, 247 [1st Dept 1989]). Even if Middleton originally had a personal right to the patents, the evidence established that any such right was assigned or was legally obligated to be assigned to the Company (*see* Dkt. 28 at 89). To the extent that Middleton needed to execute proper paperwork to validly transfer the patents to the Company, he was required to do so. Middleton's testimony that Ms. Reid was not directed by him to file this paperwork is unbelievable.

Middleton's argument that this court lacks subject matter jurisdiction to address the ownership (rather than the validity) of the patents is baseless (*Jim Arnold Corp. v Hydrotech Sys., Inc.*, 109 F3d 1567, 1572 [Fed Cir 1997] ["the question of whether a patent is valid and infringed ordinarily is one for federal courts, while the question of who owns the patent rights and on what terms typically is a question exclusively for state courts. ... It is well settled that if the patentee pleads a cause of action based on rights created by a contract, or on the common law of torts, the case is not one 'arising under' the patent laws"]; *see NeuroRepair, Inc. v The Nath Law Group*, 781 F3d 1340, 1344 [Fed Cir 2015], *accord Bioenergy Life Science, Inc. v Ribocor, Inc.*, 2015 WL 458294, at *4 [Sup Ct, NY County Feb. 3, 2015]).

Middleton's intentional misconduct, moreover, is not protected by the business judgment rule (*Amfesco Indus., Inc. v Greenblatt*, 172 AD2d 261, 264 [1st Dept 1991]; *see Wolf v Rand*, 258 AD2d 401, 404 [1st Dept 1999] ["the business judgment rule does not protect corporate officials who engage in fraud or self-dealing"]).

The proper remedy is to set aside the unlawful conveyance of the patents and require Middleton to transfer them to the Company (BCL § 720[a][2]; *see Wolff v Wolff*, 67 NY2d 638, 641 [1986]).

Plaintiff failed to prove entitlement to compensatory damages. Initially, plaintiff asserted both direct and derivative claims but made an election of remedies to proceed only with his derivative claims since, for instance, he could not pursue claims for fraudulent inducement or to enforce the agreement to obtain VERI tokens in exchange for his shares and still maintain derivative standing (Dkt. 145 at 8 [noting that plaintiff elected only to proceed with claims for "breach of fiduciary duty, violation of (BCL) § 720, and unjust enrichment"]). The derivative claims were about more than entitlement to the patents; they were about Middleton allegedly diverting what should have been part of the Company's business to himself and other Veritaseum entities,

particularly the issuance of VERI tokens. But both at trial and in his post-trial brief, plaintiff focused principally on the patent-ownership claims and barely addressed his other claims (*see id.* at 12-25), and aside from contending that the assets of the other Veritaseum companies should be transferred to the Company, he did not provide a measure for any actual monetary award.

Under plaintiff's now-accepted theory of the case, the Company should have owned the patents; thus, if the other Veritaseum entities used the patents they would have had to pay the Company a license fee (*see id.* at 34 [explaining the claim is about "patent ownership" and that "the tortious conduct stems from Middleton's transfer of assets out of Veritaseum, Inc. without consideration to the detriment of the Company"]; *see also id.* at 25 [the patents were "the foundation of the business"]). Since the other Veritaseum entities are owned by Middleton and not the Company, the terms of any such license would be subject to entire-fairness scrutiny. Middleton's failure to obtain any consideration from the other Veritaseum entities would be a breach of his fiduciary of duty of loyalty.

Plaintiff, however, did not submit any fact or expert evidence showing what a customary license fee would be. Instead, he argues that the "Veritaseum Enterprise [should] disgorge its ill-gotten gains through its misappropriation of Veritaseum, Inc.'s assets" (Dkt. 145 at 27). The court rejects this argument. While the complaint and pre-trial brief suggest that the other Veritaseum businesses should have belonged to the Company, plaintiff did not submit sufficient proof of this at trial and did not meaningfully address this issue in his post-trial brief. While the Company certainly should have been compensated for use of its patents, there is a big difference between urging that the other Veritaseum companies should have paid a royalty (either as a fixed fee or a percentage of profits) and urging that their entire business should belong to the Company. Plaintiff failed to adequately develop the arguments and proof necessary to be awarded relief on this issue.

Plaintiff's post-trial brief, moreover, does not even suggest any other damages amount that would be appropriate, instead taking an all-or-nothing approach by averring that all of the businesses should have been conducted under the umbrella of the Company and should therefore be transferred to it (*see id.* at 7 ["Middleton should be ordered to make restitution of all of Veritaseum's assets and to place the misappropriated assets, including the granted patents and other intellectual property, into a constructive trust for the benefit of the investors that he harmed. Middleton should also be disgorged of any VERI tokens that he currently owns and any profits derived from that token offering"]). Plaintiff does not explain, for instance, why Veritaseum Securities LLC's broker-dealer business was a corporate opportunity of the Company. Perhaps it was. But merely noting the nature of the businesses is no substitute for the requisite analysis of why they are corporate opportunities (*see id.* at 15-16 ["Veritaseum, LLC was formed to engage in the business of software development and research"; "Veritaseum Assets LLC was formed to be a precious metal and asset dealer"; "[Veritaseum Holdings LLC] was not an operating entity, but functioned as a holding company for [Veritaseum Securities LLC]"; "[Veritaseum

Securities LLC] was formed to pursue a broker/dealer registration with the SEC, but did not receive that registration"]). It was plaintiff's burden to prove that Middleton and his other companies further profited from the patents or other assets and opportunities of the Company. He failed to do so. The court is limited to the record developed by plaintiff and there is no basis for a compensatory-damages award.

Likewise, while any profit from the issuance of the VERI tokens should have belonged to the Company, plaintiff has not submitted any evidence that, at the end of the day, defendants actually made any profit that was not provided as restitution to the victims of the initial coin offering (ICO) pursuant to the SEC consent judgment. Of course, the only reason why plaintiff did not personally receive restitution is because he was never provided tokens in exchange for his shares in the Company, but plaintiff abandoned that direct claim in favor of his derivative claims. Regardless, the court lacks evidence that the Company actually lost an opportunity to profit from the tokens since, after all, the token issuance was unlawful and resulted in a restitution order. In other words, the Company is in pari delicto with Middleton with respect to his illegal conduct so the court would not have permitted it to recoup profits on an illegal ICO. Notably, plaintiff has not sought to prove a *Caremark* style claim or a derivative claim to recoup the losses suffered due to Middleton's illegal conduct. The court is limited to resolving the claims actually proven at trial and adequately addressed in plaintiff's post-trial brief.

Going forward, the Company may well have claims against defendants if they use the patents without authorization. But on this record, plaintiff has failed to provide proof of what damages should be awarded for what has occurred so far. The trial testimony, in fact, indicated that the patents may not actually be in use anymore by defendants and that their value to the Company may be limited to other methods of monetization (for example, filing patent-infringement lawsuits or selling the patents to a non-practicing entity). The patents' forthcoming transfer to the Company should ensure that if they are monetized the Company will benefit.

The court also need not reach the question of whether the corporate veils of the other Veritaseum entities Middleton owned should be pierced. Veil piercing is not an independent cause of action but rather a legal basis to extend liability to alter egos (*Morris v New York State Dept. of Taxation & Fin.*, 82 NY2d 135, 141 [1993]). The only claim on which relief is granted is the patent-transfer claim and since Middleton owns the patents it makes no sense to also issue this injunctive relief against the other Veritaseum entities. Moreover, even if the court found that the other Veritaseum entities had been unjustly enriched, as discussed, plaintiff has not proposed, and certainly has not proven, an appropriate damages amount.

Middleton claimed that there is no need for trust in cryptocurrency transactions because they are "unbreakable promises" (*see* Dkt. 28 at 7-8). While that may be true on the blockchain, there is a tremendous need for trust and fidelity among fiduciaries. Where, as

here, that trust is flagrantly violated, there must be real, meaningful consequences to ensure that it doesn't happen again. Anything short of significant punitive damages would further, not thwart, duplicity.

Having breached his fiduciary duty of loyalty to the Company, Middleton may be held liable for punitive damages regardless of whether his conduct was aimed at the public generally (*Sherry Assoc. v Sherry-Netherland, Inc.*, 273 AD2d 14, 15 [1st Dept 2000]). To be sure, Middleton's conduct affected the public. He solicited investment from the public based on material misrepresentations about the Company's ownership of blockchain patents and then conducted an illegal ICO, thereby resulting in a consent order that essentially destroyed the entire value of the Company. Punitive damages are warranted because Middleton's diversion of assets in breach of his fiduciary duty to the Company was intentional and deliberate, the related securities-law violations constitute aggravating and outrageous circumstances and his attempted scheme to effectively steal the patents for himself was impelled by a fraudulent motive (*see Don Buchwald & Assocs., Inc. v Rich*, 281 AD2d 329, 330 [1st Dept 2001]).

A punitive-damages award should deter "morally culpable conduct" (*Ahsanuddin v Addo*, 175 AD3d 1213, 1214 [1st Dept 2019], quoting *Halpin v Prudential Ins. Co. of Am.*, 48 NY2d 906, 907 [1979]; *see Le Mistral, Inc. v Columbia Broad. Sys.*, 61 AD2d 491, 494 [1st Dept 1978] [Punitive damages are "a punishment of the defendant for the wrong in the particular case, and for the protection of the public against similar acts, to deter the defendant from a repetition of the wrongful act, and to serve as a warning to others"]). In determining the proper amount to award, the court is mindful of the significant amount of money implicated by Middleton's wrongdoing. The small percentage of shares plaintiff purchased for almost $65,000 suggests the Company was at one point extremely valuable. Middleton raised millions of dollars by issuing tokens but did so as unregistered securities and coupled with his misappropriation of the patents, his actions have rendered the Company worthless. The SEC ordered Middleton to pay more than $8 million in disgorgement and a $1 million penalty.

Punitive damages of a similar magnitude are warranted here. Anything other than a sizeable penalty would be insufficient given that recovery belongs to the Company in which Middleton himself owns a very large stake. Under these circumstances, a $1 million punitive-damages award against him is justified. Hopefully, it will deter violations of bedrock corporate law.

Since plaintiff has created a corporate benefit by prevailing on his derivative claim, he is entitled to reimbursement from the Company of his reasonable costs and legal expenses (BCL § 626[e]). While the Company may currently lack the funds to pay plaintiff, the punitive-damages judgment should ensure it can do so.

Having found that Middleton breached fiduciary duties to the Company there is no basis for him to seek indemnification under BCL § 724.

Plaintiff elected to proceed only with his derivative claims. Thus, there is no need to address whether Middleton is liable for fraud.

The parties' remaining arguments are unavailing.

Accordingly, it is ORDERED that the parties shall promptly confer on the amount of fees and costs to be awarded to plaintiff and the form of the judgment and if they cannot agree, by January 12, 2023, plaintiff shall e-file a fee application and a proposed judgment, and by January 26, 2023, defendants may e-file objections to the fee application and a counter-proposed judgment along with a redline, and plaintiff shall email the court when these filings are fully submitted.

20221228123927JSCHECTEA25692Q4A15F4CF690FEE477CCC55FFB

DATE: 12/28/2022                                    JENNIFER G. SCHECTER, JSC

Check One:        X   Case Disposed              ☐  Non-Final Disposition